1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BENTROTT FAMILY PROPERTIES LLC,

                Plaintiff,

      v.

FOREMOST INSURANCE COMPANY

GRAND RAPIDS MICHIGAN,

                Defendant.

Case No. 3:22-cv-05319-TMC

ORDER ON MOTIONS FOR SUMMARY
JUDGMENT

## I.    INTRODUCTION

The Bentrott family has a "family cabin" located on the shore of Hood Canal in Belfair, Washington that is owned by Plaintiff Bentrott Family Properties, LLC ("Bentrott")[1], a holding company established by the family "to facilitate transfer of ownership from generation to generation." Dkt. 36 ¶ 2. Unbeknownst to the Bentrotts, adhesive flooring material used to manufacture the cabin, a "manufactured home" constructed in 1979, contained asbestos. The Bentrotts only discovered this when a water leak in the cabin in May 2021 soaked the adhesive and, according to Bentrott, caused the release of the asbestos. While the insurer of the home,

---

[1] Bentrott has two "current members": Bryan and Robert Bentrott. Dkt. 36 ¶ 1. Bryan "informally managed the LLC with [his] mother until her passing, and then afterward primarily alone, though with input from [his] brothers." *Id.* ¶ 4.

Defendant Foremost Insurance Company ("Foremost"), initially agreed to make payments under the home's policy for damage caused by the leak, Foremost refused to pay for remediation done in the cabin after testing confirmed the presence of asbestos, citing an exclusion in the insurance policy for damage caused by "pollutants." Bentrott objected to Foremost's decision, but Foremost declined to reconsider. This suit followed.

## II.    BACKGROUND

### A.    Water Leak

On May 14, 2021, the nephew of Bryan Bentrott discovered flooding at the cabin, including standing water on the "hard surface floors" and wet carpets; he informed other family members by email that the water appeared to be coming from a "pipe burst under the sink." *See* Dkt. 36 ¶ 6; Dkt 36-3 at 2. The flooding had caused "extensive water damage." Dkt. 36 ¶ 11.

At the suggestion of Foremost, Bentrott hired Servpro of Kitsap County ("Servpro") to clean up the cabin, which included "drying out and water remediation work." *See* Dkt. 36 ¶ 9–10. Servpro started its work on or about June 23, 2021. *See* Dkt. 37-11 at 2. Eventually, the repairs involved "extensive demolition of water damaged walls, cabinetry, insulation, floors and underlayment." *See* Dkt. 36 ¶ 11. Servpro completed its work "by the end of July 2021," but "it was apparent" to the Bentrotts that additional work would be needed and that they would have to seek out "another contractor to advise [them] about rebuilding the cabin or replacing it." *Id.* ¶ 15. "To this point, . . . Foremost was paying Servpro's invoices." *Id.*

Bentrott then contracted with ATI Restoration, and, on ATI's suggestion, arranged for asbestos testing in the cabin. *See id.* ¶ 17. On August 3, 2021, the testing identified "asbestos contamination" in the kitchen, laundry room, and hallway areas of the cabin, which Bryan

understood "originally had vinyl flooring over which new flooring was later installed." *Id.*

¶¶ 18–19.[2] WAT's testing report found asbestos in samples from the following:

- Gray fibrous material and brown mastic from "Remaining Floor Tile LC/Vinyl Backing" in the kitchen;

- Gray fibrous material and brown mastic from "Remaining Sheet Vinyl/M" in the kitchen;

- Gray fibrous material and brown mastic from "Remaining Sheet Vinyl/M" in the hallway;

- Gray fibrous material and brown mastic from "Remaining Sheet Vinyl/M" in the dining area; and

- Gray fibrous material and brown mastic from "Floor Tile/LC/Residual SV Backing/M" in the laundry room.

*See* Dkt. 36-9 at 6–8. According to Bryan Bentrott's declaration, asbestos was only found in areas of the house that "originally had vinyl flooring over which new flooring was later installed." Dkt. 36 ¶ 19. In summarizing the lab results in an email to Bryan, Joseph Webster, a "project director" for ATI, stated: "[i]n short, all rooms that were affected by the water loss have tested positive for asbestos." Dkt. 36-9 at 2. Bryan sent Foremost a copy of the asbestos testing report on August 27, 2021. Dkt. 36-12 at 2. A declaration from Bentrott's expert on claims adjustment Roger Howson summarizes Bentrott's theory of contamination, which Howson relied on in reaching his opinions on insurance practices: "When the water leaked from the refrigerator supply line, the mastic necessarily got very wet, which would cause it to break down, releasing whatever the mastic adhesive was made of, including the asbestos." Dkt. 40 ¶ 9.

Around ten years before the water leak, a handyman named Don Davis did remodeling work on the cabin that involved "laying Pergo flooring and carpet over different areas of the

---

[2] According to an email from Bryan Bentrott dated October 7, 2021, asbestos was "released . . . into the air." Dkt. 36-9 at 4.

cabin." Dkt. 36 ¶ 7. "[T]o [Bryan's] knowledge, this new flooring was laid over the existing

original linoleum or vinyl flooring," and Bryan was "not aware of Don removing any of the prior

linoleum or vinyl flooring for his remodeling work." *Id.*

Despite the tests only finding asbestos in certain areas, the presence of asbestos anywhere

in the house required "remediation and removal throughout the residence to ensure it is safe for

habitation." Dkt. 36 ¶ 20.

On September 16, 2021, Foremost told Bentrott that it had "completed the adjustment of

[the] loss and [was] closing [t]he claim." Dkt. 36-13 at 3. Then, on October 19, 2021, Foremost

told Bentrott in an email that it would only cover:

> abatement and testing of the affected and damaged areas ONLY. This means that
> if the abatement was done improperly (or not at all) and it contaminated other areas
> of the home that were not to be replaced due to the water damages, those new
> damages and increase in cost for abatement is NOT covered. This also includes
> areas of the home that may test positive for asbestos and are not damaged or
> otherwise connected to the damages being claimed. Your policy covers for Direct
> Sudden and Accidental loss, and only includes coverage for abatement as necessary
> to take care of the affected materials that are covered, nothing more.

Dkt. 36-14 at 2. In a letter sent to Bentrott the same day, however, Foremost stated that it was

"still conducting [its] coverage investigation." Dkt. 37-13 at 2. The letter cited the policy's

"pollution" exclusion, which excluded losses for "[t]he actual, alleged or threatened discharge,

dispersal, seepage, migration, release or escape of pollutants. . . . [And] [l]oss, cost or expense

from any governmental direction or request that any of you test for, monitor, clean up, remove,

contain, treat, detoxify or neutralize pollutants." *Id.* at 4. Then, on November 19, 2021, Foremost

sent Bentrott another letter saying that it had concluded its investigation and informing Bentrott

of its final decision on coverage for asbestos abatement:

> As we discussed on November 19, 2021, you reported positive tests of asbestos in
> areas of your home, both affected and unaffected by the water loss you reported.
> My investigation found there were various reasons for the positive tests of asbestos
> in these areas. Your policy covers for direct, sudden, accidental damages, and

specific to your claim, the sudden damages from the water leak. Your policy specifically excludes for rloss [sic] caused by pollutants, or the expenses for governmental direction to test or rid of these same pollutants. Due to an overlap in covered loss and not covered loss, we have allowed for the proper removal of asbestos tested materials that were covered due to the covered water loss; however, any materials outside of this are not covered due to these reasons.

Dkt. 36-15 at 3.

In emails sent around this time, Bryan Bentrott expressed his belief that Servpro's work had played a role in the release of the asbestos. In an October 7, 2021 email to Foremost, Bryan stated that "the Servpro demo project released some asbestos containing materials into the air," Dkt. 36-14 at 3, and, in a November 16, 2021 email, he opined that "Servpro caused this problem by doing the demo in an uneducated way," Dkt. 41-2 at 4.

In addition to refusing to cover all asbestos remediation efforts, Foremost also declined to consider the cabin a "total loss" under the policy, which provides that "[a] total loss occurs when your dwelling is damaged beyond reasonable repair. When a total loss occurs, your loss will be equal to the Amount of Insurance shown on the Declarations Page." Dkt. 36-1 at 33; Dkt. 39 at 7. According to Bentrott's calculations, the total cost of "remediation and reconstruction of the cabin" was estimated to be $162,138.90, Dkt. 35 at 7, whereas, according to Howson's declaration, the cabin was only valued between $32,000 to $69,900. *See* Dkt. 40 ¶ 5. In a March 22, 2022 email, Foremost explained:

[W]e at Foremost do NOT deem this a total loss due to WATER damages. It appears per your recently submitted information that abatement companies are advising you that the home is a total loss due to asbestos, which is not a covered loss nor covered damage type. As you'll find in the attached letter, your Foremost Policy does NOT cover the damages or loss caused by pollutants or the expenses for governmental direction to test or rid of these same pollutants (in this case: Asbestos.)

Dkt. 39 at 7.

**B.      Relevant Insurance Policy Provisions**

At the time of the water leak in May 2021,[3] Bentrott was insured by Foremost under a policy with an effective period of March 22, 2021 to March 22, 2022, Dkt. 36-4. The policy was "all risk," meaning it provided coverage for "direct, sudden and accidental physical loss to the property described in [the policy] unless the loss is excluded elsewhere in [the] policy." Dkt. 36-1 at 30.

And, relevant here, the policy included the following exclusion for losses caused by "pollutants":

> We do not insure loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
> ***
> 5. Loss caused by:
>
> a. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **pollutants**.
> b. Loss, cost or expense from any governmental direction or request that any of you test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **pollutants**.

Dkt. 36-1 at 31 (emphasis in original).

### III.      DISCUSSION

**A.      Legal Standards**

*1.      Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

---

[3] Bentrott is unsure of the exact date of the leak but provides evidence that it was discovered on May 14, 2021. *See* Dkt. 35 at 4; Dkt. 36 ¶ 6.

F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the initial burden of "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. To do so, they must present "some 'significant probative evidence tending to support the complaint.'" *Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir. 1983) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence "establishing the absence of a genuine issue of fact on each issue material to its case. Once the moving party comes forward with sufficient evidence, the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense." *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotations and citations omitted).

The evidence relied upon must be able to be "presented in a form that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). Courts may consider depositions that "identify the deponent and the action and include[s] the court reporter's certification." *D.T. v. NECA/IBEW Fam. Med. Care Plan*, No. 2:17-cv-00004-RAJ, 2019 WL 6894508, at *2 n.2 (W.D. Wash. Dec. 18, 2019) (citing *Orr. v. Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)). However, conclusory, nonspecific statements in affidavits are not sufficient, and "missing facts" will not be presumed. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889

(1990). Generally, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Consequently, in ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party . . . ." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

### 2.    *Insurance Policy Interpretation*

"Determining if insurance coverage exists is a two-step process: an insured must show that a loss is within the scope of her coverage; the insurer then bears the burden of showing that an exclusion applies." *State Farm Fire & Cas. Co. v. Ham & Rye, LLC*, 142 Wn. App. 6, 13, 174 P.3d 1175 (2007) (citing *McDonald v. State Farm Fire and Cas. Co.*, 119 Wn.2d 724, 731, 837 P.2d 1000 (Wash. 1992)); *see also Hill and Stout, PLLC v. Mut. of Enumclaw Ins. Co.*, 200 Wn.2d 208, 218, 515 P.3d 525 (Wash. 2022) ("The insured bears the burden of showing that coverage exists; the insurer, that an exclusion applies.").

The interpretation of the "four corners" of an insurance policy "is a question of law, in which the policy is construed as a whole and each clause is given force and effect." *Overton v. Consolidated Ins. Co.*, 145 Wn.2d 417, 424, 38 P.3d 322 (Wash. 2002). Insurance policies are "given a fair, reasonable, and sensible construction." *Polygon Nw. Co. v. Am. Nat'l Fire Ins. Co.*, 143 Wn. App. 753, 766, 189 P.3d 777 (2008). Coverage is determined based on "the plain meaning of the policy." *Sauter v. Hous. Cas. Co.*, 168 Wn. App. 348, 354, 276 P.3d 358 (2012).

An "all risk" policy like Bentrott's, *see* Dkt. 36-1 at 30, means that "any peril not specifically excluded is included, *i.e.*, covered." *Sixty-01 Ass'n of Apartment Owners v. Pub. Serv. Ins. Co.*, No. C22-1373-JCC, 2023 WL 5152666, at *3 (W.D. Wash. Aug. 10, 2023) (citing

*Findlay v. United Pac. Ins. Co.*, 129 Wn.2d 368, 378, 917 P.2d 116 (Wash. 1996)). "In such instances, inclusionary clauses must 'be liberally construed to provide coverage.' And exclusionary clauses must be strictly construed against the insurer, as they are contrary to the 'fundamental protective purpose of insurance.'" *Id.* (first citing *Riley v. Viking Ins. Co. of Wis.*, 46 Wn. App. 828, 829, 733 P.2d 556 (1987); then citing *Vision One, LLC v. Phila. Indem. Ins. Co.*, 174 Wn.2d 501, 512, 276 P.3d 300 (Wash. 2012)); *see also McDonald Indus. v. Rollins Leasing Corp.*, 95 Wn.2d 909, 913, 631 P.2d 947 (Wash. 1981) ("It is fundamental that ambiguities in the policy must be construed against the insurer and in favor of the insured. This rule applies with added force in the case of exceptions and limitations to the policy's coverage.").

**B.      Subject Matter Jurisdiction**

Before addressing each motion's merits, the Court must ensure that it has subject matter jurisdiction over Bentrott's claims. *See United Invs. Life Ins. Co. v. Waddell & Reed Inc.*, 360 F.3d 960, 966–67 (9th Cir. 2004) ("[A] district court's duty to establish subject matter jurisdiction is not contingent upon the parties' arguments. . . ." and it generally has an obligation to establish subject matter jurisdiction "*sua sponte*, whether the parties raised the issue or not").

"[T]he burden of establishing [jurisdiction] rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). At summary judgment, the allegations in the complaint must be supported by evidence in the record. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Bentrott alleges in its complaint that the Court has diversity jurisdiction under 28 U.S.C. § 1332(a)(2). Dkt. 1 ¶ 2.1.

Diversity jurisdiction requires "complete diversity," meaning that "each plaintiff must be of a different citizenship from each defendant." *Grancare, LLC v. Mills ex rel. Thrower*, 889 F.3d 543, 548 (9th Cir. 2018). A corporation is a citizen of the state or foreign state where it is

incorporated and of the state or foreign state where it has its principal place of business. *See* 28 U.S.C. § 1332(c)(1). In addition, to have diversity jurisdiction, the amount in controversy must exceed "the sum or value of $75,000." 28 U.S.C. § 1332(a). Bentrott's complaint alleges, and the record supports, that Bentrott is domiciled in Washington and Foremost in Michigan. Dkt. 1 ¶ 2.1; Dkt. 10; *see* Dkt. 36 ¶ 2. And Bentrott's motion requests $75,585.52 in actual damages (not including liquidated damages under the Washington CPA, which is an issue for trial). *See* Dkt. 35 at 25–27. Bentrott has presented sufficient evidence to establish subject matter jurisdiction over its claims.

**C.    Analysis**

>   *1.    Contractual Claims*

>>   *a.   Whether Asbestos Release was a Covered Loss*

In determining whether a particular loss is covered by an insurance policy, the insured first bears the burden of showing that the loss is within the scope of the policy's coverage. *State Farm Fire & Cas. Co.*, 142 Wn. App. at 13. "The scope of the policy's coverage is . . . distinct from the issue of causation." *Sunbreaker Condo. Ass'n v. Travelers Ins. Co.*, 79 Wn. App. 368, 374, 901 P.2d 1079 (1995). When an "all risk" policy is at issue, the insured meets its step-one burden by showing that the loss falls within the general language of the policy's all risk provision. *See Seattle Tunnel Partners v. Great Lakes Reinsurance (UK) PLC*, 200 Wn.2d 315, 321, 516 P.3d 796 (Wash. 2022) (holding that the first step of the insurance coverage test was met for an all risk policy because "the Policy's insuring clause provided that the insurers would cover 'direct physical loss, damage or destruction . . . not specifically excluded herein ... to the Interest Insured,'" and it was "undisputed that the TBM (the insured interest) suffered 'physical loss, damage or destruction'" (internal citations omitted)).

Foremost argues for the first time in reply that Bentrott has a burden to prove that the loss was "fortuitous" to prove it is entitled to coverage. *See* Dkt. 49 at 3 n.4. It cites federal decisions in Washington that have predicted how the Washington Supreme Court would rule on the issue. *See, e.g.*, *Churchill v. Factory Mut. Ins. Co.*, 234 F.Supp.2d 1182, 1189 (W.D. Wash. 2002) (relying on federal decisions in "find[ing] as a matter of law that under an all-risks policy, the insured bears the burden of showing that it suffered a loss and that the loss is fortuitous."); *Canyon Ests. Condo. Ass'n v. Atain Specialty Ins. Co.*, No. 2:18-cv-01761-RAJ, 2021 WL 2021 WL 1208581, at *4 (W.D. Wash. Mar. 31, 2021) (citing *id.*) (same). When deciding state law issues, federal district courts are bound by decisions of the state's highest court. *Aceves v. Allstate Ins. Co.*, 68 F.3d 1160, 1164 (9th Cir. 1995). And when the state's highest court has not addressed an issue, district courts are bound by any on-point federal appellate decisions in their circuit, unless subsequent decisions of the state's highest court have indicated that the federal appellate court's decision was incorrect. *See Kona Enters. v. Est. of Bishop*, 229 F.3d 877, 884 n.7 (9th Cir. 2000). In the absence of binding authority on a state law issue, "the task of the federal courts is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986). Here, while the Ninth Circuit has adopted a definition of "fortuity" under Washington state law*, Ingenco Holdings, LLC v. ACE Am. Ins. Co.*, 921 F.3d 803, 815 (9th Cir. 2019), neither the Washington Supreme Court nor the Ninth Circuit has squarely addressed whether the burden of showing a loss was fortuitous falls on the insurer or the insured. *See Ingenco Holdings, LLC v. Ace Am. Ins. Co.*, No. 2:13-cv-00543-RAJ, 2022 WL 716880, at *6 (W.D. Wash. Mar. 10, 2022) (making an "*Erie* guess" on this issue on remand).

Although *Seattle Tunnel Partners* did not specifically address fortuity, the Court is satisfied that under that decision, an insured generally meets its step-one burden to show that a

loss is within the scope of an all-risk policy's coverage by showing that the insured suffered a loss that falls within the all-risk provision's general language. *See supra* Section III.C.1. And because Foremost raised this issue for the first time in reply to its motion (and did not raise it in its response to Bentrott's motion)—depriving Bentrott the ability to respond—the Court will not engage in an "*Erie* guess" analysis. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *Dragu v. Motion Picture Indus. Health Plan for Active Participants*, 144 F. Supp. 3d 1097, 1113 (N.D. Cal. 2015) (declining to consider a new issue raised in a reply brief and noting that the opposing party had "not been able to respond to [the] new argument")..

Here, as in *Seattle Tunnel Partners*, the policy insures "risk of direct, sudden, and accidental physical loss to the property described in [the policy] unless the loss is excluded elsewhere in [the] policy." Dkt. 36-1 at 30. And here it is also "undisputed" that there was "physical loss" to the Bentrott cabin.[4] "The question" then becomes whether Foremost has met its burden to show that "one of the alleged causes of that damage falls within" the policy's pollutant exclusion. *See Seattle Tunnel Partners*, 200 Wn.2d at 322.

Bentrott does not dispute that asbestos is a "pollutant," as defined in the policy, but argues that coverage is justified under the efficient proximate cause ("EPC") rule, which the Washington Supreme Court has explained as follows:

> Under Washington law, the rule of efficient proximate cause provides coverage where a covered peril sets in motion a causal chain[,] the last link of which is an uncovered peril. If the initial event, the "efficient proximate cause," is a covered peril, then there is coverage under the policy regardless whether subsequent events within the chain, which may be causes-in-fact of the loss, are excluded by the policy.

---

[4] The Court also declines to consider Foremost's conclusory argument, made for the first time in reply, that Bentrott has not "demonstrated" that the asbestos release was "direct, sudden, and accidental," *see* Dkt. 49 at 3. *See Eberle*, 901 F.2d at 818; *Dragu*, 144 F. Supp. 3d at 1113.

*Xia v. ProBuilders Specialty Ins. Co. RRG*, 188 Wn.2d 171, 182–83, 400 P.3d 1234 (Wash. 2017) (internal quotations and citation omitted); *see also Vision One, LLC*, 174 Wn.2d at 519 ("The efficient proximate cause rule applies only when two or more perils combine in sequence to cause a loss and a *covered peril* is the predominant or efficient cause of the loss.").

"The efficient proximate cause rule operates as an interpretive tool to establish coverage when a covered peril sets other causes into motion which, in an unbroken sequence, produce the result for which recovery is sought." *Vision One, LLC*, 174 Wn.2d at 519. "[T]he rule has broad application" and is not "limited to any one particular type of insurance policy." *Xia*, 188 Wn.2d at 183. However, because the rule "operates in favor of coverage," the converse of the rule—"*i.e.*, where an excluded risk sets in motion a causal chain, coverage should be precluded as to all the causal events in the chain"—is not the law; rather, "[w]hen an excluded peril sets in motion a causal chain that includes covered perils, the efficient proximate cause rule does *not* mandate exclusion of the loss." *Id.* at 519–20 (emphasis added).

But even though the "converse" of the EPC rule—that a loss must be excluded if the relevant causal chain was initiated by an excluded peril—is not itself a common law rule, *id.* at 519–20, it is "perfectly acceptable for insurers to" include such a rule in the policy, one "that den[ies] coverage when an *excluded* occurrence initiates the causal chain and is itself either the sole proximate cause or the efficient proximate cause of the loss," *Xia*, 188 Wn.2d at 183; *see also Corliss Condo. Owners Ass'n v. Nat'l Sur. Corp.*, 631 F. Supp. 3d 942, 947 (W.D. Wash. 2022) ("Although an insurance policy cannot contract around the efficient proximate cause rule, Washington Courts have 'left open the possibility that an insurer may draft policy language to deny coverage when an excluded peril initiates an unbroken causal chain.'" (quoting *Vision One, LLC*, 174 Wn.2d at 520)). Therefore, "[s]hould an insurer wish to exclude otherwise-covered

losses that result from a causal chain set into motion by an excluded peril (i.e., include an inverse EPC-rule provision) the insurer must include specific language in the policy to this effect." *Franssen Condo. Ass'n of Apt. Owners v. Country Mut. Ins. Co.*, No. 2:21-cv-00295-BJR, 2022 WL 10419015, at *8 (W.D. Wash. Oct. 18, 2022).

"Typically, the determination of efficient proximate cause is a question of fact; however, 'when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion,' the issue of efficient proximate cause 'may be a question of law for the court.'" *Corliss Condo. Owners Ass'n*, 631 F.Supp.3d at 947 (quoting *Graham v. Pub. Emps. Mut. Ins. Co.*, 98 Wn.2d 533, 539, 656 P.2d 1077 (1983)).[5]

As a predicate issue, the Court agrees with Bentrott that, were it to squarely address the question, the Washington Supreme Court would decide that the insurer bears the burden of proof with respect to the efficient proximate cause rule. "When the state's highest court has not squarely addressed an issue, we must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises and restatements for guidance." *All. for Prop. Rts. and Fiscal Resp. v. City of Idaho Falls*, 742 F.3d 1100, 1102 (9th Cir. 2013). As discussed, once an insured shows that a loss is within the scope of a policy's coverage, the burden shifts to the insurer to show that an exclusion applies. And, importantly, "[t]he scope of the policy's coverage is . . . distinct from the issue of causation." *Sunbreaker Condo. Ass'n*, 79 Wn. App. at 374. Thus, if causation is not relevant to the first step of the analysis, it must be part of the second step, which is the insurer's burden to prove. California courts are in accord with this conclusion. *See Strubble v. United Services Auto. Assn.*, 35 Cal. App. 3d 498, 504, 110 Cal. Rptr. 828 (1973) (placing burden on the insurer to

---

[5] "Whether an issue is a question of law or a question of fact is a substantive question, to which state law applies." *Encompass Ins. Co. v. Coast Nat'l Ins. Co.*, 764 F.3d 981, 984 (9th Cir. 2014).

show that a covered peril did not proximately cause the loss at issue for an all-risk policy). The Court therefore "approximates" that if the Washington Supreme Court considered this issue, it would decide that part of the insurer's burden is to show that a covered peril was not part of a sequence of events leading to the loss at issue.

Foremost supports its motion by arguing that "there is no evidence to support an argument that the failure of the pipe released asbestos" and that Bryan Bentrott "reported on multiple occasions that it was Servpro of Kitsap County's work that resulted in the release of materials containing asbestos. If there were a chain of events starting with the leak, it was broken by the faulty work of Servpro of Kitsap County." Dkt. 38 at 10. The first argument misstates the parties' respective burdens; as established above, it is the insurer's burden to produce evidence showing the application of an exclusion. The second argument fares no better; although made without citation, Foremost appears to be referring to Bryan's statements in the parties' email communications regarding coverage that "the Servpro demo project released some asbestos containing materials into the air," Dkt. 36-14 at 3, and "Servpro caused this problem by doing the demo in an uneducated way," Dkt. 41-2 at 4. A party cannot meet its burden to create a genuine issue of material fact by relying on "conclusory and speculative" opinions in the record. *See Thornhill Pub. Co. v. Gen. Tel. & Electronics Corp.*, 594 F.2d 730, 738 (9th Cir. 1979); *Mateo v. M/S Kiso*, 805 F. Supp. 761, 775 (N.D. Cal. 1991) ("Conclusory, speculative testimony is insufficient to raise genuine issues of fact . . . ."). Testimony must also be based on "personal knowledge." Fed. R. Civ. P. 56(c)(4). The emails are entirely conclusory and do not contain any indication that Bryan's opinions were based on personal knowledge of the scientific cause of the asbestos release. These statements therefore fail to create a genuine issue of fact as to causation.

Foremost's response to Bentrott's motion raises largely the same arguments but also relies on a declaration from its expert, Mark Lawless, who stated:

1

2

> Plaintiff admitted that Don Davis did a bathroom remodel prior to the leak, and he changed the flooring in the bathroom. Based upon the pictures taken by ServPro, the prior flooring appears to have been the same as in the kitchen and would have contained asbestos in the mastic used to adhere the linoleum to the wooden flooring underneath. In CSMI's opinion, the remodel work caused asbestos release as it involved changing the flooring in the bathroom.

3

4

Dkt. 46 ¶ 4.

5

6    The Court declines to consider this evidence for multiple reasons. First, Foremost filed

7    Lawless's declaration three days after its response and one day before Bentrott's deadline to

8    reply. Dkts. 42, 46. This district's local rules require "supporting papers" to be filed "together"

9    with motions for summary judgment. *See* LCR 16(b)(5). And "[t]he Court has the discretion to

10   strike untimely pleadings that fail to comply with local rules." *Allstate Indem. Co. v. Lindquist*,

11   No. C20-1508-JLR, 2020 WL 7075215, at *1 (W.D. Wash. Dec. 3, 2020).[6] The Court agrees

12   with Bentrott that it was prejudiced by the late filing, which came one day before its deadline to

13   reply. The Court will not consider Lawless's untimely-filed declaration.

14   But even if the Court considered this evidence, it would not create a genuine dispute of

15   material fact. Lawless does not state in his declaration when the bathroom remodel occurred, but

16   other evidence in the record shows it was ten years before the water leak (and contests whether

17   any original flooring was removed or disturbed in the process). *See* Dkt. 36 ¶ 7. While Lawless

18   states his belief that the remodeling work released asbestos, he does not offer any opinion on

19   whether or how that release was the source of the asbestos found in the testing that required

20   remediation ten years later. Even accepting Lawless's opinion as correct, no reasonable juror

21   could conclude that the asbestos release discovered in 2021 was not caused by a covered peril

22   based only on the fact that asbestos was also released ten years prior.

23

24

---

[6] Foremost never moved for an extension of time or leave to file its declaration late.

For the above reasons, the Court concludes that Foremost has failed to meet its burden either (1) in seeking summary judgment, to prove as a matter of law that the water leak was not the efficient proximate cause of the asbestos contamination; or (2) in opposing summary judgment, to show competent evidence from which a jury could conclude that the water leak was not the efficient proximate cause of the asbestos contamination. Because Bentrott has satisfied its burden for step one of the coverage analysis (and no reasonable juror could conclude otherwise), and because Foremost has failed to produce competent evidence showing that the water leak (a covered peril) was not part of the causal chain leading to the asbestos release, Bentrott's motion for summary judgment on this ground is granted, and Foremost's motion is denied.[7]

  *b. Total Loss Determination*[8]

Bentrott also asks the Court to "find and declare the cabin a total loss under the policy, requiring Foremost to pay the balance of the $157,000 policy limit for replacement cost coverage." Dkt. 35 at 18. The policy's total loss provision provides that "[a] total loss occurs when your dwelling is damaged beyond reasonable repair. When a total loss occurs, your loss will be equal to the Amount of Insurance shown on the Declarations Page." Dkt. 36-1 at 33. And the policy's declaration page, in turn, provides an "amount of insurance" of $157,000 for the "dwelling." *Id.* at 3.

Bentrott argues that a dwelling is "damaged beyond reasonable repair" when the estimated cost of repairs of the insured home exceeds its "actual cash value" ("ACV"). *See* Dkt. 35 at 7–8, 18–19. Bentrott relies on the opinion of its claims adjustment expert, Roger

---

[7] The Court need not consider Bentrott's alternative argument that the same loss is covered under Washington's "rip and tear" or "get to" rule. *See* Dkt. 35 at 17–18.

[8] Only Bentrott moves for summary judgment on its breach of contract and declaratory relief claims as to Foremost's total loss determination.

Howson, who states in his declaration "that Foremost sold Bentrott a replacement cost policy, as distinguished from a policy based on actual cash value (ACV)." Dkt. 40 ¶ 4; *see also id.* ¶ 6 ("In my professional opinion, the Bentrott cabin is a total loss because the cost of repairs even for the undisputed water damage far exceed the cabin's ACV if repaired to its condition before the water leak, meaning the cabin is beyond reasonable repair."). Howson then explains:

> The significance of ACV versus replacement cost here is that, once the loss exceeds the ACV of the property, whether a car or a manufactured home, the insured property is properly declared a "constructive total loss," which is a term of art in insurance for when the insured property could be repaired, but the cost of repair exceeds the value of the property would have after the repair. In other words, did [sic] makes no sense to spend more to repair something if you can just buy another one of like kind and quality for less than you would spend on repairs.

Dkt. 40 ¶ 5.

As discussed, in Washington, contract interpretation is generally a question of law, not of fact, *see Overton*, 145 Wn.2d at 424, and coverage is determined based on "the plain meaning of the policy." *Sauter*, 168 Wn. App. at 354. Terms defined within a policy are to be construed as defined, while undefined terms are given their "ordinary and common meaning, not their technical, legal meaning." *Allstate Ins. Co. v. Peasley*, 131 Wn.2d 420, 424, 932 P.2d 1244 (Wash. 1997). Here, the policy defines total loss as: "A total loss occurs when your dwelling is damaged beyond reasonable repair."

The question of when it would not be reasonable to repair damage is inherently a factual one. While the evidence Bentrott points to on total loss (such as the cash value of the manufactured home, Dkt. 40 ¶ 5, and Howson's opinion about typical claims settlement practices, *id.*) can certainly be considered by a jury when answering that question, Bentrott has not explained how this shows there is no genuine factual dispute that the damage was beyond reasonable repair. Bentrott's motion is denied as to Bentrott's breach of contract and declaratory relief claims for Foremost's total loss determination.

2.      *Extra-Contractual Claims – Asbestos Coverage Determination*

Both parties also move for summary judgment on Bentrott's claims that Foremost acted

in bad faith in investigating Bentrott's insurance claim, violated the Washington Consumer

Protection Act, and violated Washington's Insurance Fair Conduct Act.

Each claim "turns on the reasonableness of [Bentrott's] conduct in denying coverage

without investigating the claim." *Lakewood Shores Homeowners Ass'n v. Cont'l Cas. Co.*, No.

C18-1353-MJP, 2018 WL 9439866, at *2 (W.D. Wash. Dec. 14, 2018). An insurer's duty to not

act in bad faith is not "insurmountable"; "[t]he insurer is required only to fulfill its contractual

and statutory obligation to fully and fairly investigate the claim." *Id.* There is no bad faith where

"the insurer acts honestly, bases its decision on adequate information, and does not

overemphasize its own interest." *Werlinger v. Clarendon Nat. Ins. Co*., 129 Wn. App. 804, 808

(2005). "Context is critical to determining whether an insurer committed bad faith." *Berkshire*

*Hathaway Homestate Ins. Co.*, 132 F. Supp. 3d at 1288 (first citing *Am. Mfrs. Mut. Ins. Co. v.*

*Osborn,* 104 Wn. App. 686, 701, 17 P.3d 1229 (2001); then citing *Keller v. Allstate Ins. Co.,* 81

Wn. App. 624, 633, 915 P.2d 1140 (1996)). Bad faith is a question of fact. S*mith v. Safeco Ins.*

*Co.*, 150 Wn.2d 478, 485, 78 P.3d 1274 (Wash. 2003).

Bentrott first argues that Foremost acted in bad faith by conducting "no investigation of

how the asbestos was released into the home," even though the insurer bears the burden with

respect to the efficient proximate cause rule. Dkt. 35 at 20–21. "An insurer must make a good

faith investigation of the facts before denying coverage and may not deny coverage based on a

defense that reasonable investigation would have proved to be without merit." *Rizzuti v. Basin*

*Travel Serv.*, 125 Wn. App. 602, 618, 105 P.3d 1012 (2005). As evidence of this lack of

reasonable investigation, Bentrott points to Foremost's communications of its decision to deny

coverage for all asbestos remediation efforts. According to Bentrott, the fact that these

communications do not discuss whether the water leak may have been the efficient proximate cause of the asbestos release shows that Foremost did not sufficiently investigate this issue. Namely, in an October 19, 2021 email, Foremost's Claims Representative told Bryan Bentrott that:

> The policy will cover abatement and testing of the affected and damaged areas ONLY. This means that if the abatement was done improperly (or not at all) and it contaminated other areas of the home that were not to be replaced due to the water damages, those new damages and increase in cost for abatement is NOT covered. This also includes areas of the home that may test positive for asbestos and are not damaged or otherwise connected to the damages being claimed.

Dkt. 36-14 at 2. Foremost then indicated that its investigation was not yet complete, and asked Bentrott for "abatement and testing documentation showing what has tested positive for asbestos, and what cost there is for the abatement; specifically only for the materials affected by the water loss." *Id.* A month later, Foremost sent Bentrott a letter indicating it had completed its investigation, and concluding that asbestos damage generally was not covered:

> As we discussed on November 19, 2021, you reported positive tests of asbestos in areas of your home, both affected and unaffected by the water loss you reported. My investigation found there were various reasons for the positive tests of asbestos in these areas. Your policy covers for direct, sudden, accidental damages, and specific to your claim, the sudden damages from the water leak. Your policy specifically excludes for rloss [sic] caused by pollutants, or the expenses for governmental direction to test or rid of these same pollutants. Due to an overlap in covered loss and not covered loss, we have allowed for the proper removal of asbestos tested materials that were covered due to the covered water loss; however, any materials outside of this are not covered due to these reasons. Unfortunately, there is no coverage for this portion of your claim based on the facts known to us at the present time.

Dkt. 36-15 at 3.

The Court finds this evidence to be sufficient for Bentrott to avoid summary judgment, but not for the Court to enter summary judgment in Bentrott's favor. As mentioned, bad faith is generally a question of fact. Here, Foremost was aware that asbestos was released into the air, and that the resulting asbestos contamination was discovered shortly after the water leak

occurred. It was reasonable for Foremost to at least investigate the possibility that the water leak, which it was treating as generally covered under the policy, was a cause of the asbestos release and contamination. *Cf. Capelouto v. Valley Forge Ins. Co.*, 98 Wn. App. 7, 19, 990 P.2d 414 (1999) (finding insurer's failure to investigate efficient proximate cause was not unreasonable where the insurer had determined "that all causes of the loss were excluded from coverage" and, therefore, "[f]urther investigation to determine the efficient cause of the loss would not have invalidated the insurers' defense that all possible causes were excluded from coverage"). Indeed, Foremost's November 19, 2021 letter stated that its investigation "found there were various reasons for the positive tests of asbestos."

As explained above, when multiple causes potentially lead to a loss, the efficient proximate cause rule may be relevant. Yet Foremost's denials of coverage do not mention any investigation into whether the water leak (a covered peril) may have been the efficient proximate cause of all asbestos contamination in the house. A reasonable juror viewing this evidence in the light most favorable to Bentrott could conclude that Foremost did not investigate the issue, especially in light of an insurer's legal duty to "provide a *reasonable* explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim." WAC 284-30-330(13) (emphasis added).

But this conclusion requires drawing an inference in Bentrott's favor that the failure to include an explanation as to efficient proximate cause in these communications necessarily means Foremost did not investigate the issue. While a reasonable juror could draw this inference, the evidence presented does not foreclose the possibility that Foremost did investigate efficient proximate cause in good faith, but merely failed to state its findings in detail when it explained its coverage decisions to Bentrott. In sum, as is usually the case, these claims present issues of fact for the jury with respect to bad faith that cannot be determined on summary judgment. Both

1    parties' motions are denied as to Bentrott's bad faith claim relating to Foremost's investigation

2    of the cause of the asbestos release.

3         3.      *Extra-Contractual Claims – Total Loss Determination*

4         Bentrott also argues that Foremost's total loss determination constituted bad faith because

5    "any reasonable insurance professional would conclude that when the cost of remediation and

6    restoration was far in excess of the Actual Cash Value, the property is a total loss," citing to

7    Roger Howson's declaration. Dkt. 35 at 22 (citing Dkt. 40 ¶¶ 4–7). "A denial of coverage that is

8    unreasonable, frivolous, or unfounded constitutes bad faith." *Lakehurst Condo. Owners Ass'n v.*

9    *State Farm Fire and Cas. Co.*, 486 F.Supp.2d 1205, 1213 (W.D. Wash. 2007) (citing *Smith*, 150

10   Wn.2d at 484). As explained above, the question whether the Bentrott cabin was "damaged

11   beyond reasonable repair" is a factual question for the jury's determination. Thus, the Court

12   cannot adopt Bentrott's position, as doing so would require the Court to decide, as a matter of

13   law, that the cabin was "beyond reasonable repair." Rather, it follows that the question of

14   Foremost's bad faith as to the total loss determination is also a question of fact for the jury. Both

15   motions are denied as to this claim.

16        4.      *CPA Claim for Violation of WAC 284-30*

17        Generally, to prove a CPA claim, a party must show "(1) an unfair or deceptive act or

18   practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to

19   the party in his business or property, and (5) which injury is causally linked to the unfair or

20   deceptive act." *St. Paul Fire and Marine Ins. Co. v. Onvia, Inc.*, 165 Wn.2d 122, 134, 196 P.3d

21   664 (Wash. 2008). While a CPA claim can be proven by showing bad faith, as alluded to above,

22   the first prong of the claim can also be proven by showing a violation of the administrative

23   regulations governing the claims-handling process set out at 284–30 WAC. *See id.* at 129, 134

24   (noting a party could bring a CPA claim based on a violation of 284–30 WAC even though it had

"failed" to prove bad faith). Bentrott argues that it also has a CPA claim for Foremost's

violations of the following provisions of WAC 284-30-330:

> (1) Misrepresenting pertinent facts or insurance policy provisions.
> (4) Refusing to pay claims without conducting a reasonable investigation.
> (13) Failing to promptly provide a reasonable explanation of the basis in the insurance
> policy in relation to the facts or applicable law for denial of a claim or for the offer of a
> compromise settlement.

First, Bentrott argues that "Foremost conducted a bad faith investigation in violation of at

least WAC 284-30-330 (1), (4), and (13) by (a) falsely asserting to the insured that the pollution

exclusion applied to bar coverage for the asbestos contamination without conducting any

efficient proximate cause analysis before denying coverage or even after the efficient proximate

cause doctrine was explicitly raised by the insured." Dkt. 35 at 23. Bentrott has not provided any

evidence that Foremost "misrepresented" any facts in explaining its coverage determinations to

Bentrott. As to the reasonableness standards in subsections (4) and (13), the Court incorporates

its reasoning from above and concludes that issues of fact remain as to whether Foremost

conducted a reasonable investigation or provided a reasonable explanation for its denial of

coverage for asbestos remediation. *See supra* Section III.C.2; *Capelouto*, 98 Wn. App. at 19

(citing precedent regarding bad faith in construing WAC 284-30-330's requirement to conduct a

reasonable investigation).[9] For these reasons, Foremost's motion for summary judgment is

granted (and Bentrott's motion is denied) as to Bentrott's CPA claim based on misrepresenting

pertinent facts and both motions are denied as to the claim based on the reasonableness of

Foremost's investigation and explanation of its coverage decision.

Bentrott also argues that Foremost violated the CPA by failing to complete its

investigation of coverage within thirty days of "notification of the asbestos contamination" under

---

[9] Bentrott does not cite any authority interpreting these regulations to support its arguments.

WAC 284-30-370, which states that "[e]very insurer must complete its investigation of a claim within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time." Bentrott argues that the thirty-day period began to run when Bryan sent Foremost a copy of the asbestos testing report on August 27, 2021, *see* Dkt. 36-12 at 2, and that Foremost's final coverage determination, made in its November 19 letter, was too late under the statute.

"As with other bases for a claim of bad faith, however, delay does not constitute bad faith unless it is due to a frivolous and unfounded reason." *Rizzuti*, 125 Wn. App. at 620. Foremost argues it had a valid reason to delay its determination based on Bryan Bentrott's own statement, in an email to Foremost on October 7, 2021, that he was planning on sending "additional information" regarding the claim after a planned October 25, 2021 meeting. *See* Dkt. 36-14 at 3. And in response to that email, Foremost's claims representative told Bryan that Foremost still had not received information relevant to its coverage determination. *See id.* at 2 ("As far as what I'm looking for from you/Joseph: I need the abatement and testing documentation showing what has tested positive for asbestos, and what cost there is for the abatement; specifically only for the materials affected by the water loss."). Bentrott does not respond to this evidence in its reply or provide any additional evidence showing that Foremost's "delay" was nonetheless the result of a "frivolous or unfounded reason." Foremost's motion as to Bentrott's CPA claim based on a delayed completion of the investigation is granted and Bentrott's motion as to the same is denied.

### 5.    *IFCA Claim*

Bentrott also raises a separate IFCA claim based on the same reasoning used for its claims regarding reasonableness, violations of WAC 284-30-330(1)(4) & (13), and WAC 284-30-370. The IFCA does not provide independent causes of action for violations of WAC 284-30-330 or 370; rather, plaintiffs must show that the insurer acted unreasonably to have a cause of

action and "regulatory violations [are] relevant to the apportioned attorneys' fees and damages associated with that derivative violation." *Perez-Crisantos v. State Farm Fire and Cas. Co.*,187 Wn.2d 669, 683, 389 P.3d 476 (Wash. 2017) (en banc). The Court incorporates its decisions on these issues above for Bentrott's IFCA claim.[10]

> 6. *Damages*

Bentrott also requests damages predicated on a finding by the Court in its favor declaring the property to be a total loss. Given that the Court declined to rule in Bentrott's favor on this issue and given that Bentrott does not specify a request for damages based only on a judgment in its favor on the breach of contract claim, the Court declines to rule on damages at this time.[11]

### IV.   CONCLUSION

For the above reasons, the parties' motions for summary judgment are granted in part and denied in part as follows:

- Bentrott's motion as to its claim for declaratory relief and breach of contract as to Foremost's determination of coverage for asbestos remediation is GRANTED and Foremost's motion as to the same is DENIED;

- Bentrott's motion as to its claim for declaratory relief and breach of contract as to Foremost's total loss determination is DENIED.

- Both motions are DENIED as to Bentrott's bad faith claim relating to Foremost's investigation of the cause of the asbestos release;

---

[10] The Court does not consider Bentrott's conclusory arguments that "[the] same facts establish as a matter of law" violations of WAC 284-30- 350, WAC 284-30-360, and WAC 284-30-380. *See* Dkt. 35 at 24–25. Summary judgment for Foremost is granted for these claims, and Bentrott's motion for the same is denied.

[11] Bentrott also concedes that statutory liquidated damages under the Washington CPA and IFCA are also issues for trial. Dkt. 35 at 27.

- Both motions are DENIED as to Bentrott's bad faith claim relating to Foremost's total loss determination;

- Foremost's motion is GRANTED as to Bentrott's CPA and IFCA claims based on misrepresenting pertinent facts and Bentrott's motion as to the same is DENIED;

- Both motions are DENIED as to Bentrott's CPA and IFCA claims based on the reasonableness of Foremost's investigation and explanation of its coverage decision;

- Foremost's motion as to Bentrott's CPA and IFCA claims based on a delayed completion of the investigation is GRANTED and Bentrott's motion as to the same is DENIED; and

- Foremost's motion as to Bentrott's IFCA claim for violations of WAC 284-30- 350, WAC 284-30-360, and WAC 284-30-380 is granted, and Bentrott's motion for the same is DENIED.

The parties are further ORDERED to submit a joint status report within fourteen days of this Order's issuance proposing a new trial date and pretrial schedule for the remaining deadlines in the case.

Dated this 9th day of August, 2024.

Tiffany M. Cartwright
United States District Judge

ORDER ON MOTIONS FOR SUMMARY JUDGMENT - 26